Thank you. We will now take up the matter of Hulsey v. Saul. May it please the Court, my name is Josephine Girard and I represent Lynn Hulsey in her case before the Commissioner. Lynn Hulsey is 60 years old when she applied. Our argument completely deals with past relevant work. Lynn Hulsey's issue is that she has a cervical spine bulging and she can't raise her left arm or she doesn't have full movement. She also has carpal tunnel in both hands. Lynn Hulsey also has a mental impairment. Can you hear me? She has a mental impairment. You could lower the microphone a bit. There, is that good? Okay. Much better. Thank you. So, the situation here is that the past relevant work is a very vague concept that the Commissioner uses. The plaintiff has the burden of proof at the first four steps and then at step five the Commissioner has the burden. But overall, in the whole concept, this is a non-adversarial hearing process to bring out the truth of whether someone can work or not. Now in Lynn Hulsey's case, she has an unusual situation. She's a very presentable person. She's had 13 jobs in the last 10 years, but she's never been able to work any of them more than a couple months. So, the problem here is that she's got a mental condition and she has a physical one. So just on the physical alone, she cannot return to her past relevant work. The only job that we contend that is eligible under the past relevant work Commissioner's regulations could be considered her work as a casino cashier. Now, this Court has already determined that practical, just reasonable, it's not appropriate to say that someone can work as a cashier if they can only use their right arm. The new regulations of the Department of Labor are going to come into play later. They're not part of this case. All the Dictionary of Occupational Titles, probably because of fingering, keyboards being predominant, you will not qualify for any of those. So here we have someone who worked. What happened was she worked at a cashier in a casino and she left the job because she couldn't keep up. Her condition did get worse. She tried to become a plebonomist, which she went to training for this, and then she took a job, but only for two months she couldn't work that. It's sort of reasonable to assume that you do need both hands to draw blood. It's a very practical situation. Now, we're arguing very finely over whether past relevant work, you have to have worked it a durational time to qualify as past relevant work. Six months, and you have to have made significant gainful activity. We have an ambiguous problem here because she made literally $1.50 over per month, which could state that that is significant gainful activity. We contend it's not. But just on the overall, the overall argument is that she can't work her past relevant work. And then we have the mental situation where she's been treated consistently for her mental illness. She has inability to sustain work. She leaves jobs. She tries to work, but her condition of extreme anxiety and unable to sustain work, that has been ongoing and it got worse. Now, when you have mental and physical, the ALJ is required to address both. And in this case, the ALJ decided that her mental condition was not severe, so he would not address it. He did go through the rules and say, well, you know, she washes dishes and she does a couple things. But this court's already ruled you have to be able to do it eight hours a day, five days a week. And we don't have, we don't have any sign of that. You're allowed to do some work, but you have to show you can do it five days a week, six hours a day. So I would ask this court to really look at this past relevant work because this is an example where it's not being applied properly. If it can be applied, if it's so vague that we can't use it. Let me help. I'm sorry. No, no, not at all. Yes. I'm trying to figure out the structure of your argument. Part of it, of course, is that the cashier job and the phlebotomist job, in your view, aren't past relevant work. Right. And if they aren't past relevant work, we move to step five. And she's disabled because under the medical vocational profiles. And at that point, the government bears the burden of proof. Right. She does. Right. But it's also, I guess you also have the argument if those two jobs are past relevant work, you can argue that she's not disabled, that she's disabled even as to those two. And you're making both arguments. I am because I think overall it's within this court's and the commissioner's philosophy that if you can't sustain, if you can't do that work and we don't take into work with accommodations, she has two, she has mental and physical. But say you could somehow work. I have a hard time even imagining how you could draw blood with one hand. But if you could have a cashier maybe could have special accommodations. But social security commissioner doesn't take into account for accommodations because that worker would have to maybe take longer. And we're just doing the straight social security regulations under the federal rules. Help me understand the nature of her disability with respect to the one hand and help me understand the nature of a disability with respect to mental disability. Okay. As to the hand, my understanding from the record, I hope I have the right record that I'm thinking of this from, is that she's wearing, I guess, braces on both. She has carpal tunnel and the ALJ agreed that she has carpal tunnel. But she also has, we have an MRI and an X-ray and doctor's reports, that she doesn't have the use of her upper left arm. She can't reach, she can't raise. The ALJ did not even discuss her left hand. He discusses her right hand. But she's got, we have doctor's reports that she can't use her upper left hand part of her body. And then we have the mental. Let me make sure I understand that. That is to say she's got carpal tunnel syndrome on both hands. Assuming both hands are down here on the desk, she can use them both to about the same degree? No, it's because she has a neck problem. She has a bulging disc on her, she's got cervical radiopathy. And she's had an operation on it, but it's still gotten worse. So she has extreme. I understand that she's got a reaching up problem, but I'm asking what happens if both hands are down on the desk? Well, just on the, she can't use, she can't flex. And is that true for both hands, the degree to which she can't flex? Well, I think the doctors are basically talking about her left arm because in that one situation, just with the cervical radiopathy, and that's not being discussed. But she has carpal tunnel on both. The ALJ just discussed the carpal tunnel. I'm not a doctor, so I don't know if the carpal tunnel actually relates to the cervical radiopathy, but that's where we are with that. It's that she's in pain when she raises it. So it's not a matter, because it's her spine, it's not a matter of she could just keep her hands down. And she's had epidural treatments in her neck to deal with the pain in this arm? Yes, and because she's also on psychotropic medication, she also has a problem of being very slow. So we've got a lot of limitations here, and if she had not worked these two jobs, she would apply, she would be eligible under the, go into the medical vocational profiles. So it's, to me, this is a... She's elderly? She's 60, yeah. I don't think that's elderly, but Social Security... No, I don't either. Social Security seems to think so. I do not think that's old at all. However, I have to agree that when I'm in pain, or when one is in pain, it can increase the problem. And the Social Security rules, they're trying to streamline this, because we have so many cases going through. And I feel that it's very important that if we have... What sort of relief do you want? I want credit as true, because the medical vocational profiles would streamline her. And she can't work any fingering jobs, even if she was 50.  I did think the lobotomist physician seemed very much not realistic. No, we wouldn't want that. Nobody drawing blood with one hand. But, because you have to have, I was thinking about it, you have to have one hand down to steady the person. So she took that job. She's someone who likes to work. She keeps trying to get... She's gotten 13 jobs in the last 10 years, and none of them has she been able to continue, sustain. Now, I think she left the cashier job and the phlebotomist job voluntarily. That is to say, she wasn't fired. She was fired from the phlebotomist job. She was fired from that one. She couldn't sustain that. She went to school training, and the commissioner was suggesting that that should be taken into account. But the commissioner's rules say, no, we're talking about on-the-job training. You can't just go to school, and that counts for time on the job. But she voluntarily moved from the cashier position to the phlebotomist. Yeah, she thought she could get an easier job that would be part-time, because she couldn't. It's in a casino, and I'm envisioning chips and money and practical. That's what it says in the regulations, and there's no variation in the job. But we also have the mental problem, because she hasn't been able to sustain work. So that's just on the board of it. And the only other little argument is that in order to dismiss a mental condition and not apply it, you have to basically, if you have a culpable claim, you have to show or talk about or address it, the commissioner does, whether that affects the job. And because he said, oh, it's not severe, so I'm not going to discuss it, that doesn't take you out of the requirements of the mental impairment. Because mental impairment is a problem here, because you really do need a professional to talk about that. And there was a consultant just on the mental, and the consultant said because her physical problems were a condition, but she could lift or carry 15 pounds, that doesn't have anything to do with her mental ability to sustain work. She hasn't sustained work, so it's sort of evident. You better reserve the rest of your time. Yes, I will. Thank you.  May it please the Court, Daniel Talbert for the Commissioner of Social Security. I had some opening remarks I was going to make, but I think it looks like I have a lot to talk about, so I'm just going to get to some responsive comments to what Ms. Gerard had to say. And, of course, I'm happy to answer any questions that the panel has. The first thing I want to point out is that Ms. Gerard's characterization this morning is actually largely inaccurate, not an accurate characterization of the record of the ALJ's findings or of the evidence here. One of the major points that she was making was that the claimant, Ms. Holsey, was not able to use her left hand. The evidence doesn't support that. And certainly substantial evidence, which is the standard of review here, supports the ALJ's finding, the administrative law judge's finding, that the claimant could, and I'm turning to page 21 of the administrative record here, that the claimant could occasionally reach overhead bilaterally, so that she could reach overhead up to a third of the day with either arm. She is unlimited reaching in other directions, and she is able to perform frequent handling and fingering with her non-dominant left upper extremity. So that's up to two-thirds of the day she could use her left hand, and she is unlimited with using the right hand. So the issue here, it's not that she can never use her left hand. It's just that she can't constantly use her left hand. And for the demands of her past relevant work as a phlebotomist and as a casino cashier, both of them require only that she frequently use her hands. Well, but, you know, I don't think it's going to be divided in the following way. Say in an eight-hour day, the first two-thirds I use my left hand, and at the end of the day I don't have to. So what are we talking about in terms of frequency and one-third, two-thirds? I don't get it. Sure, Your Honor. So what we're really talking about, I think the primary source of information about jobs is the Dictionary of Occupational Titles. And the Dictionary of Occupational Titles says that for those two occupations, phlebotomist and gambling cashier, they require frequent use of the hands, frequent handling, reaching, fingering, et cetera. Right. So that means two-thirds of the day. And as Your Honor said, it's not all at once. When you say that means two-thirds of the day, what are you talking about? It essentially means up to about six hours of an eight-hour day. It doesn't mean that you're at all times. You're not constantly at all times doing those activities. You might be doing certain other things during different points. But the Dictionary of Occupational Titles, which, yes, Your Honor. Does it mean, well, you have to be able to use your hands for five minutes providing you stop for ten minutes? Or does it mean the first six hours of the day you have to be able to use your hands and the remaining hours you don't? Not necessarily the first six hours, but it's just, and again, this is what the Dictionary says, nobody's challenged it. I don't think Ms. Gerard has challenged it. It certainly wasn't challenged at the hearing. The Dictionary says that for those occupations, you need to use your hands for six hours of the day. And as I said, there hasn't been any challenge or question. Is that what it says literally for six hours of the day? Well, what it says literally is frequent. And then in the definitional part of the Dictionary, frequent is defined as up to two-thirds of the day. And if we take eight hours, we take two-thirds of that, it's like five and a half hours roughly. And if we're talking sort of ordinary work, unless you're a nonstop typist in pretty much any job, one-third of the time you're not actually using that hand. I can't imagine a job where you're using a full eight hours nonstop. I think generally that's true, Your Honor, and I think that's why these occupations, the phlebotomist and yamakashier, it's frequent use of the hands, not constant. So I think it looks like we're all on the same page, at least I hope we are. For that point, the ALJ's findings here and the medical evidence of record here is consistent with saying that she could do those jobs because you don't need to constantly, as you say, like you're typing or something all day, you don't need to use your hands all day long. So that's essentially what we have on that point. I'm happy to address any other questions about the positions, but I feel like we might have come to an understanding on that. You know, I've been seeing, Judge Wardlaw and I have been seeing Social Security disability cases for over 20 years now, and I'm always distressed when we get a Social Security case where you look at the evidence and the person can do certain things in terms of just physical evaluation, but then you also look at the evidence and it's clear that you've got somebody who's been trying to work and they have been unable to sustain work for a long time and everybody in his dog knows that this person is actually not employable. What do we do with that? So what we do with that, and I think the leading case on that is probably Gatliff v. Commissioner. It's a 1999 case. I don't think it's cited in the briefs, but that was a case about an individual who had a personality disorder, and he had, I don't know, 100, 150 jobs over his lifetime, and he lost more than half of them just because he couldn't get along with people, couldn't deal with people, constantly fired. So if it's a case like that, then yes, that's someone who their past work shows that they just can't work. Ms. Hulsey is not that person. The opposing counsel argued that she had, I think, 13 jobs or something over the last 10 years and she could only do them for a few months. That's inaccurate. If we actually look at the record, and I'm going to refer to the exact page because I think it's important that we look at what the record specifically shows. If we look at her work history report, it's on page 231 of the administrative record. She worked as a phlebotomist for 2 or 3 months. She worked as a casino cashier for 5 or 6 months. But she also worked as a bank teller for over a year at a time. She worked as a cashier at a grocery store for a little bit over a year. So she's not someone who's had long-term careers or anything like that, but she's certainly somebody who has performed a number of jobs for long enough to learn them. So that's the other aspect that I find frustrating, like Judge Fletcher, is that the system almost penalizes someone who's trying to get work as opposed to malingering. Well, Your Honor, I'm going to disagree with that. It doesn't penalize someone for trying to work because if she's worked... So the idea at step 4 is that if you've done a certain job in the past, you're more likely to be able to return to that job than you are to learn an entirely new job. Does that really account for the... I'm sorry to interrupt. I didn't mean to do that. But does that really account for the degenerative nature of her health problem that her disc is continually getting worse? So even though she's had this prior work, she's able to do it, but she can't do it now. So let's talk about that, Your Honor. Let's talk about the medical evidence. And I think this is pretty important here. The medical consensus from all the doctors that give opinions is that she's able to perform at least the range of work that the administrative law judge said. We don't have any treating source opinion that says that she's more limited than the ALJ said. There's just nothing in the record to support her claims. Nobody's endorsed those assertions, those claims of limitations. What we do have is we have, on the physical side of it, since that's what you're talking about right now, we have two doctors. I'm not sure how to say the name, but I think Dr. Joytlin, with a Z-H, said that she didn't have a severe physical impairment. And then we had another doctor named Dr. Ammon, who said, I think in June 2014, well, yes, she does have severe physical impairments, and she's able to perform this range of light work. That's consistent with what the ALJ found, and that's consistent with those jobs she did in the past. So, again, substantial evidence fully supports the ALJ's finding that she remains capable of performing those jobs. Now, I want to briefly touch on some other comments that Ms. Girard has made about the claimant constantly losing work and being unable to sustain work. That's an inference, perhaps, from the record or speculation about the record, but that's not plainly what the record shows. As I think one of your honors said, I don't remember now which one, but I think one of your honors stated that she left the gambling cashier position to be a phlebotomist. It wasn't that she lost the cashier job because she couldn't do it anymore. She had been training to be a phlebotomist, and then she went to do that position. And as far as losing, leaving her job as a phlebotomist, she said on the record that she left for personnel reasons. Now, we don't... That's a euphemism for, I got canned. It could very well be, your honor. And there's any number of reasons why someone could be terminated, could be fired from a job. Is it possible that it's for impairment-related things? Perhaps, but it's not clearly the case. And certainly here, where the claimant, represented by an attorney at the hearing, told the ALJ in the pre-hearing brief, her past work is as a phlebotomist and she can't do it anymore. And when the vocational expert looked at this record and said, yeah, she has past relevant work as a phlebotomist and other things, and here's what she's able to do based on the limitations that you've presented to me, the ALJ quite reasonably concluded that she was able to do those jobs. Now, the fact that the claimant didn't challenge any of that at the administrative level and then comes into district court and comes up with new theories about disability and new ways to challenge things, that's not the way these cases are supposed to work. The ALJ is the fact-finder. That's sort of like the trial level of this, where the evidence is presented, where the arguments are made, where witnesses are questioned, et cetera. And at that level of it, there's nobody that's saying, well, wait a minute, there's testimony that this person could be a phlebotomist, this person could be a cashier. She never really successfully did those jobs. So there's no development of that below. There's no issue with that. We'd say that's essentially forfeited or waived because of it. But there's really nothing in the record that she's even pointing to now that supports that she can't do those jobs, given the limitations that she has that the ALJ has found based on substantial evidence. I'm looking to see... Yes, Your Honor. I'm questioning whether the ALJ properly discounted her evidence of pain in this case. You said it wasn't severe, but is there clear and convincing evidence that it wasn't? I think we have a case very close to this, Garrison v. Colvin, where she reported pain and she received epidural shots, and we found that evidence of her pain was credible. So, Your Honor, I'm going to distinguish this case from Garrison. Respectfully, this is nothing like Garrison v. Colvin. That was a case where there were some really... That's not quite as severe. And that's significant. Did the claimant in Garrison have injections? I think that's the case. Did this claimant have an injection at the end? Yes. The doctor erroneously described that as conservative treatment. The doctor erroneously? Well, the ALJ. Just like here, they called it conservative treatment. It's invasive. Now I understand what Your Honor's concern is. It's calling the injection conservative treatment. No, not just that. And using that to discount her testimony as to her pain, resulting from her disc problem. All right. So I'll respond to that then. First, conservative treatment, it's a weird term. Frankly, conservative treatment is a medical term that means something short of surgery. I mean, that's basically what you see it meaning in most records. Instead of doing surgery, they'll do conservative treatment. But the important thing is, how effective is the treatment? The claimant has recommended to do a certain thing, and if the claimant has the treatment, does it help? Here the claimant had that one injection at the end of the relevant period. It did provide her with some relief. And the notable thing that I want to point out, and this is what the ALJ focuses on, and I apologize for flipping pages here, but I want to turn to the page where the ALJ discusses it specifically. It's on page... I think it's on page 23, yes. Sort of the middle of page 23. She was recommended to possibly have a cervical epidural steroid injection in May of 2014. She didn't schedule a follow-up visit, and then she didn't have the injection for over a year. And it's recommended again about a year later, and then she says, okay, I will have it. She has it, and it's helpful. So the ALJ could reasonably infer, well, for most of this period, you know, medication is fine. She's doing okay with things that aren't this particular injection. Now, towards the end of the period the ALJ is looking at, she says, okay, I will have this injection. It does end up helping her. And if it happens that her pain is getting worse, and if she needs more significant or aggressive treatment later on, she's entirely free to file a new application and say, look, my condition worsened. I started taking this more aggressive treatment. I started having these injections. Maybe this would be the period here ends in December 2015, so maybe this is early 2016 onward. And if the record shows that it's escalating, she's needing these more severe therapies, then that could support a finding of disability on a later period. But in this record, I want to emphasize, and I think we note this in the brief, there's, again, no medical opinion that supports any significant limitations beyond what the ALJ found. This treatment record is fairly minimal. There's not a lot going on here. And there is one injection at the very end of the period. We submit that Garrison doesn't stand for the proposition that if there's one epidural injection, that automatically means someone's disabled. In this case, the ALJ properly took it in the context of the record as a whole, said it was recommended. She didn't particularly need it for a while. She eventually had it, and then it was helpful. The ALJ was free to rely on that as evidence to support his finding. ALJ also made a number of well-supported findings that we note in the brief. I see that I'm over my time, so unless there's further questions, I will urge the Court to review the brief, to look at the paucity of evidence in this record on the lack of medical source opinions, and to affirm the ALJ's well-supported and very detailed findings. All right. Thank you, Counsel. Thank you, Your Honor. Here I am. I have to disagree with the Commissioner on the... First, let's just try the Dictionary of Occupational Titles on cashier and... Let's turn the page to the wrong page again. The Dictionary of Occupational Titles states that it's constant for cashier and phlebotomist. It's constant fingering and handling, and constant... I've got to read this because it's so apropos. What part of the dictionary are you referring to? The Dictionary of Occupational Titles, and I will... I'll just put that there, and I'll turn the page here. Sorry. There I am. Okay. We're talking cashier checker and gambling cashier. Dictionary of Occupational Titles, 211. It's on my brief opening, page 15. I cite to it, a constant extending hand or arm in any direction, constant picking, pinching, or otherwise working with primary fingers rather than with the whole hand or arm, constantly seizing, holding, grasping, or turning, otherwise working with the hands, the ability to move the fingers and manipulate small objects rapidly. That's under Dictionary of Occupational Titles, 211.462-014, cashier checker and gambling cashier, 211.4, and bank teller, 211.362. The phlebotomist is the same. That doesn't really count because she didn't work it long enough, but it's frequent extending hand, frequent seizing and grasping, and it doesn't fall short. I thought the relevant dictionary portion was 211.462-022, cashier gambling. Okay. Well, I have the cashier check as 211. I looked it up, 462-014. Now, the vocational expert says he doesn't really know and he thought that this is what it was. So what he states has to be affirmed by the ALJ. So that is the Dictionary of Occupational Titles we contend for gambling cashier. So that's that one. The other one is that why gambling cashier? Because she worked for the Red Hat casino. Okay. I know. I'm assuming. I envision chips coming in and having to put the chips in. I think they now probably do it with little cards, but that's what the dictionary states. So it is frequent handling. And then the other situation is that we have to remember, she's not getting medical care because she didn't get disability. So epidurals cost her. Everything costs her. And she's doing the best she can. But I'm going to the second point, which the Commissioner brought up, is that there were no doctors' opinions outside of the non-treating opinions that said she was limited, and that is not true. Dr. Aguilar states Hulsey's grip has gotten worse. Washing her hair is a tedious task for her because of the pain and discomfort. She's been dropping things a lot because of her numbness. Her left-hand pain and paralysis is more intense. That's ER 472. Then we also have whether her jobs were – whether we can even talk about the phlebotomist. It has to be – you have to have worked the job enough time to say that you could. And she did leave it because she didn't get along with people. And she also might – we don't know. We can only imagine. But perhaps because she couldn't keep up with the physical work, she wasn't – that job is – that discussion is not there. I think, as you mentioned, and I think this is relevant, is that past relevant work is supposed to be someone who's – I think it's duplicate, and I don't see the point of it. I think we should just look at the dictionary occupational titles. But if somebody's been working a job for so long, they could do it automatically. I mean, I'm imagining they just know how to do something. But if they've only worked it for a short period of time, it doesn't qualify as past relevant work. And we are using the Department of Labor's standards. She doesn't meet those standards. She can't do constant fingering, and she can't even do frequent fingering. And the reason that her pain is – you can't have an epidural as a constant treatment. That's not something that's used, that I know, to constantly relieve your problems. So do you want to sum it up because you're well over your time? Yeah, I'll sum it up. I'll sum it up. I think that past relevant work is not really appropriate here. And if it's an ability to sidestep the medical vocational profiles, then there's a conflict. However, I'm going to rely on Lamere that we have to have just common sense. And common sense is that you're not going to be a good employer or employee if you can't use a finger, if you go for cashier job work, especially in a casino. All right. Thank you very much, Counsel. Hulsey v. Saul is submitted, and we'll take up Anthony v. Trax International Corporation.
judges: Wardlaw, W. Fletcher, Linn